UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KAREN DURANT,

                Plaintiff,                              1:17-CV-0902
                                                      (GTS/CFH)
v.

THE UNITED STATES OF AMERICA,

                Defendant.
_____

APPEARANCES:                                  OF COUNSEL:

GOLDSTEIN & GOLDSTEIN, LLP             PAUL J. GOLDSTEIN, ESQ.
  Counsel for Plaintiff
One Civic Center Plaza, Suite 541
Poughkeepsie, New York 12601

HON. GRANT C. JAQUITH                  JOHN D. HOGGAN, JR., ESQ.
U.S. Attorney for the N.D.N.Y.           Assistant U.S. Attorney
  Counsel for Defendant
445 Broadway
James T. Foley Courthouse
Albany, New York 12201

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

      Currently before the Court, in this personal injury action filed by Karen Durant

("Plaintiff") against the United States of America ("Defendant") under the Federal Tort Claims

Act ("FTCA"), 28 U.S.C. §§ 1346, 2671, *et seq*., are Defendant's motion to preclude Plaintiff's

expert witness from adducing testimony in this case (particularly with regard to a motion for

summary judgment), and Defendant's motion for summary judgment pursuant to Fed. R. Civ. P.

56. (Dkt. No. 29.) For the reasons set forth below, Defendant's motion to preclude is granted,

and Defendant's motion for summary judgment is granted.

## I.    RELEVANT BACKGROUND

### A.    Summary of Plaintiff's Complaint

This action arises out of Plaintiff's medical office visit to the Institute for Family Health, Kingston Family Practice Center ("IFH") on February 17, 2016.  Generally, Plaintiff's Complaint alleges that "Defendant, its agents and/or employees" negligently administered medical treatment that ultimately resulted in her sustaining "severe, painful and permanent injuries."  (*See generally* Dkt. No. 1 [Plf.'s Compl.].)  More specifically, the Complaint alleges that, while she was being treated for an illness at IFH, Plaintiff sustained an injury when Natasha Benevides-Stevens ("Nurse Benevides-Stevens"), a licensed practical nurse ("LPN") employed by IFH, over-inflated a manual blood pressure cuff around Plaintiff's arm.  (*Id.*)  Based on these factual allegations, Plaintiff asserts a single FTCA claim against Defendant.  (*Id.*)

### B.    Statement of Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendant in its Statement of Material Facts and expressly admitted by Plaintiff in her response thereto.  (*Compare* Dkt. No. 29, Attach. 1 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 34 [Pl.'s Rule 7.1 Resp.].)[1]

---

[1]    The Court notes that Plaintiff has expressly admitted all but one of Defendant's twenty-six (26) asserted facts.  (*See generally* Dkt. No. 34 [Pl.'s Rule 7.1 Resp.].)  Moreover, Plaintiff has failed to provide a citation in support of her sole denial.  (*Id*. at ¶ 9.)  Finally, Plaintiff has set forth an additional twenty (20) facts that she contends are "not in dispute."  No such statement by a non-movant is envisioned by either Fed. R. Civ. P. 56 or Local Rule of Practice 7.1(a)(3), the latter of which merely permits a statement of additional material facts that the non-movant contends "are in dispute."  N.D.N.Y. L.R. 7.1(a)(3); *Binghamton-Johnson City Joint Sewage Bd. v. Am. Alternative Ins. Corp.*, 12-CV-0553, 2015 WL 2249346, at *11 n.1 (N.D.N.Y. May 3, 2015).  However, the Court will liberally construe this statement as one of

1.      On February 17, 2016, Plaintiff was seen as a patient at IHF complaining of symptoms including nasal congestion and an ear ache, and seeking a refill for her previously prescribed blood pressure medications.

2.      Her vital signs were taken at 11:23 a.m. by a licensed practical nurse (Natasha Benevides-Stevens).

3.      Her blood pressure was recorded to be 148/100 by the licensed practical nurse.

4.      Plaintiff does not know the exact size of the blood pressure cuff that was used to measure her blood pressure, but she believes the cuff was smaller than the cuffs that were normally used on her based on the feeling of it.[2]

5.      After having her blood pressure taken, Plaintiff complained of arm pain because the licensed practical nurse had purportedly inflated the blood pressure cuff "up to 300."

6.      During her deposition, Plaintiff testified that, while the licensed practical nurse was inflating the blood pressure cuff, Plaintiff shouted out in pain because the cuff was becoming too tight.[3]

---

additional material facts that Plaintiff contends are in dispute.

[2]      (Dkt. No. 29, Attach. 3, at 51.)

[3]      The Court notes that, although neither party knows the size of the blood pressure cuff that allegedly caused Plaintiff's injury, the parties dispute whether an undersized pressure cuff could have caused such an injury.  Plaintiff argues that this question is answered in the affirmative, relying on Dr. Weingarten's findings that her injury was "caused by the over-inflation of the blood pressure cuff . . . ."  (Dkt. No. 34, Attach. 1, at 6 [Pl.'s Opp'n Memo. of Law].)  Defendant argues that this question is answered in the negative, relying upon its own expert witness, who concluded that Plaintiff's "'claim that the use of an undersized [blood pressure] cuff could be origin for excessive force . . . is incongruent with the broadly understood and accepted physics of how a blood pressure cuff interacts with the patient's arm.'" (Dkt. No. 29, Attach. 2, at 12 [Def.'s Memo. of Law].)

7.     In Plaintiff's medical records of this visit, there is no mention that she reported any complaints of pain to either her treating nurse or physician assistant at IHF.

8.     At some point during her visit, Plaintiff's blood pressure was taken for a second time and was recorded to be 138/94.

9.     Plaintiff's retained medical expert (Dr. Alexander Weingarten, M.D.) determined there was no inconsistency between Plaintiff's two blood pressure readings.[4]

10.     During the same visit at IHF, the physician assistant conducted a physical examination of Plaintiff and noted that she had "full range of motion of upper and lower extremities bilaterally [and] [g]ood hand grip bilaterally."

11.     On February 18, 2016, the physician assistant telephoned Plaintiff to inform her of the results of blood tests that were conducted the day before.

12.     In her documentation of that call, the physician assistant recorded no complaints of pain by Plaintiff relating to her office visit the previous day.

13.     On February 22, 2016, Plaintiff was treated at the Kingston Hospital Emergency Department where she complained of signs and symptoms including "localized pain and swelling in her right forearm."

14.      During her visit to Kingston Hospital, Plaintiff's blood pressure was recorded to be 160/94.

15.     The medical staff at Kingston Hospital diagnosed Plaintiff with "right upper extremity edema," and recommended that Plaintiff "follow up with her primary care doctor and

---

[4]     (Dkt. No. 29, Attach. 3, at 151.)

4

to take over-the-counter ibuprofen or acetaminophen for pain."

16.     On March 14, 2016, Plaintiff was seen in a neurology office.  In the Progress Notes documenting the visit, a nurse practitioner (Kathryn McDonnell) stated that, during the visit, Plaintiff told her that, while or after being treated at IHF on February 17, 2016, she "[e]xperienced right upper extremity] pain and throbbing several hours with progressive numbness and tingling from elbow down."  The nurse practitioner also stated that Plaintiff was diagnosed with an ulnar nerve injury "at the forearm level."

17.     On May 24, 2016, Plaintiff was seen by a vascular surgeon, who determined there was no underlying vascular diagnosis that could be causing Plaintiff pain.

18.     On August 17, 2016, Plaintiff was seen by an orthopedic surgeon, who did not render a diagnosis or prescribe Plaintiff any medications.  This was Plaintiff's only office visit to the orthopedic surgeon.

20.     Plaintiff has missed no time at work as a result of the injuries alleged in the Complaint, other than intermittently to attend medical appointments.

21.     Plaintiff has not undergone any corrective medical procedures and does not receive any physical therapy for her alleged injuries.

22.     On December 29, 2016, Plaintiff filed a Notice of Claim with the United States Department of Health and Human Services ("HHS").

23.     On August 16, 2017, Plaintiff filed this personal injury action.

24.     On September 11, 2017, HHS denied Plaintiff's claim.

**C.     Expert Report of Dr. Alexander Weingarten, M.D.**

Although the parties have submitted numerous expert reports, the parties' motion papers

challenge the qualification and reliability of only Plaintiff's expert, Dr. Alexander Weingarten, M.D., an anesthesiologist. Therefore, the Court will summarize the qualifications and testimony of only Dr. Weingarten.

According to his expert report, Dr. Weingarten is a board certified anesthesiologist and has practiced anesthesiology and pain management for the last thirty-five years. (Dkt. No. 35, at 194-95.) Since 1996, Dr. Weingarten has also held a sub-speciality certification in pain management. (*Id*. at 195.) Dr. Weingarten received a Bachelor's of Arts degree from Queens College, as well as a medical degree from the State University of New York, Upstate Medical University. (*Id*. at 188.) Dr. Weingarten completed an anesthesia residency at Long Island Jewish Hillside Medical Center (which is now known as Northwell Health). (*Id*.) Dr. Weingarten went on to complete a pediatric anesthesiology fellowship at Children's National Medical Center in Washington, D.C. (*Id*.) Dr. Weingarten is licensed to practice medicine in New York. (*Id*.) Currently, Dr. Weingarten holds an assistant clinical professorship in the Department of Pharmacology at New York Medical College. (*Id*.) On average, Dr. Weingarten treats roughly 2,000 patients per year. (*Id*. at 198.)

Dr. Weingarten reviewed various records to form his opinion. Specifically, Dr. Weingarten reviewed the following records: (1) medical records from office and hospital visits dated February 17, 2016, February 22, 2016, March 14, 2016, April 25, 2016, May 24, 2016, June 29, 2016, November 17, 2016, December 10, 2016, January 13, 2017, August 17, 2017, and March 1, 2018; (2) nerve condition velocity and electromyography ("EMG") testing results dated April 5, 2016; (3) ultrasound testing results dated February 23, 2016, and May 24, 2016; (4) magnetic resonance imaging ("MRI") testing results dated March 21, 2016, and March 28, 2016;

(5) the deposition transcripts of Nurse Benevides-Stevens; (6) the expert report served by Defendant's expert, Michael Bowley; (7) medical records generated from Plaintiff's office visit at IFH; and (8) the medical records associated with Plaintiff's visits to Kingston Hospital, Vassar Brothers Hospital, eRiver Neurology, and University Orthopedics. (*Id.* at 188-92 [Weingarten Report and Opinion].)

After reviewing the above-stated records, Dr. Weingarten concluded that Plaintiff's diagnoses were a result of a breach of the standard of care by Nurse Benevides-Stevens, as well as her supervisors at IFH. (*Id*. at 191.) More specifically, Dr. Weingarten concluded Nurse Benevides-Stevens and her supervisors at IFH failed to use a proper technique for monitoring blood pressure and that an "oversized" blood pressure cuff should have been used to obtain Plaintiff's blood pressure. (*Id*.) In rendering this opinion, Dr. Weingarten found that "it is apparent that an undersized blood pressure cuff was used to obtain the blood pressure reading in her right arm, which led to the over inflation of the cuff and the subsequent pain and swelling which developed." (Dkt. No. 35, at 191.) According to Dr. Weingarten, Nurse Benevides-Steven' use of an undersized blood pressure cuff breached the standard of care, and that "[t]his breach in the standard of care was the proximate cause of the subsequent morbidity . . . including swelling, pain, and the development of complex regional pain syndrome." (*Id*.) Lastly, Dr. Weingarten concluded that, because Plaintiff's symptoms have not resolved in the two years since the alleged injury occurred, her symptoms are "chronic and permanent." (*Id*.)

## II.    PARTIES' ARGUMENTS ON DEFENDANT'S PENDING MOTIONS

### A.    Motion to Preclude

Generally, in support of its motion to preclude, Defendant argues as follows: (1) the only

factual basis for Dr. Weingarten's opinion that the blood pressure cuff was undersized was Plaintiff's own speculation that the blood pressure cuff felt too small (a factual deficiency that was exacerbated by the fact that he did not even measure the circumference of her arms); (2) Dr. Weingarten opined that the use of an undersized blood pressure cuff could increase the risk for an injury without knowing how much pressure a manual blood pressure cuff exerts during a routine examination (and despite this fact that such opinion is incongruent with the broadly understood and accepted physics of how a blood pressure cuff interacts with a patient's arm); and (3) Dr. Weingarten's causation theory relied on what the Second Circuit has called an "apples and oranges comparison" by comparing the pressure from a manual blood pressure cuff (which here was purportedly 300 mmHg, an amount of pressure that has been deemed safe by the relevant scientific community) with the crushing pressure from a motor vehicle. (*See generally* Dkt. No. 29, Attach. 2, at 8-12 [Def.'s Memo. of Law].)

Generally, in Plaintiff's response in opposition to Defendant's motion to preclude, she argues as follows: (1) Dr. Weingarten is qualified as an expert because, although he is not a specialist in the exact area of medicine that is implicated by Plaintiff's injury, he has enough relevant experience and qualifications in a closely related field that his opinion would not be speculative; (2) although the factual basis of Dr. Weingarten's opinion (that the blood pressure cuff was undersized) was Plaintiff's own testimony on the subject, that testimony has not been contradicted by the admissible record evidence; (3) in rendering his opinion that the blood pressure cuff was undersized, Dr. Weingarten also relied on the temporal proximity between the use of the blood pressure cuff and the onset of Plaintiff's injury, and employment of a different diagnosis which excluded other possible causes (most specifically, the lack of any other trauma

suffered by Plaintiff).  (*See generally* Dkt. No. 34, Attach. 1, at 8 [Pl.'s Opp'n Memo. of Law].)

Generally, in its reply, Defendant argues as follows: (1) Dr. Weingarten's opinion cannot be based on a differential diagnosis (i.e., a "ruling out" of other potential causes), because he did not, and cannot, first "rule in" the undersized blood pressure cuff as the suspected cause through the use of a scientifically valid methodology; (2) indeed, rather than addressing the efficiency or inefficiency with which an undersized cuff transfers force to a patient's arm as compared to that with which a properly sized does so, Dr. Weingarten (who admits he is not a "major physics person") speculated that the use of a smaller cuff "would seem" to create more compression when it was over-inflated than would the properly sized cuff (which, again, is contradicted by broadly understood and accepted physics of how a blood pressure cuff interacts with a patient's arm); and (3) although Dr. Weingarten opines that injury can occur due to an inflation pressure of 300 mmHg within "one or two minute[s]," the record contains no admissible evidence from which a rational factfinder could conclude that the cuff in question was inflated for more than a few seconds.  (*See generally* Dkt. No. 36, at 1-2 [Def.'s Reply Memo. of Law].)

### B.    Motion for Summary Judgment

Generally, in support of its motion for summary judgment, Defendant argues as follows: (1) Plaintiff has failed to establish a genuine dispute of material fact regarding the alleged breach of the standard of care for nurses because Defendant has proffered evidence to support the notion that the proper standard of care was followed, and Plaintiff has failed to make a rebuttal showing, through the introduction of expert medical testimony, that Defendant departed from the requisite standard of care; and (2) Plaintiff has failed to establish a genuine dispute of material fact regarding "whether the blood pressure test was the proximate cause of Plaintiff's alleged injury"

9

because "there has never been a reported case of injury from the use of a manual blood pressure cuff in an outpatient setting, and Plaintiff's expert does not dispute that fact," and the proximate cause is not a triable issue of fact for a factfinder to consider because Plaintiff's expert's proximate causation theory relies on speculative methodologies. (*See generally* Dkt. No. 29, Attach. 2, at 16-17 [Def.'s Memo. of Law].)

Generally, in Plaintiff's response in opposition to Defendant's motion for summary judgment, she argues as follows: (1) Dr. Weingarten need not establish the applicable standard of care for nurses (which was established by one of Defendant's experts) but need only establish (and has established), that Defendant deviated from that standard of care; and (2) because "the Court must construe facts in the light most favorable to non-movant," and "resolve all ambiguities and draw all reasonable inferences against the movant," the Court must find, based on Dr. Weingarten's admissible expert opinion, that Nurse Benevides-Stevens "used the wrong cuff and pumped the cuff up too high . . . ." (*See generally* Dkt. No. 34, Attach. 1, at 6-7 [Pl.'s Opp'n Memo. of Law].)

Generally, in its reply, Defendant argues it is entitled to summary judgment because, in Plaintiff's opposition memorandum of law, she did not address the relevant standard of care for nurses in obtaining a blood pressure reading. (*See generally* Dkt. No. 36, at 6-7 [Def.'s Reply Memo. of Law].)

## III.   RELEVANT LEGAL STANDARDS

### A.   Legal Standard Governing a Motion to Preclude Expert Witness Testimony

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Specifically, Fed. R. Evid. 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of opinion or otherwise if:
    **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
    **(b)** the testimony is based upon sufficient facts or data;
    **(c)** the testimony is the product of reliable principles and methods; and
    **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

From this rule, the Supreme Court and Second Circuit have derived the following legal standard. As an initial matter, generally, the trial judge is to act as a "gatekeeper," charged with determining whether the proffered testimony satisfies a number of standards, including, among other things, that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or to determine a fact in issue." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013) (quoting Fed. R. Evid. 702[a]). "In other words, '[e]xpert testimony must be helpful to the [trier of fact] in comprehending and deciding issues beyond the understanding of a layperson.'" *Marvel Characters, Inc.*, F.3d at 135 (quoting *DiBella v. Hopkins*, 403 F.3d 102, 121 [2d Cir. 2005]).

Additionally, the proposed expert must be "qualified" to give the proffered opinion. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 & nn. 7, 10. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *U.S. v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citation omitted). In assessing whether a proposed expert is "qualified," the trial judge should remember the "liberal[ ] purpose" of Fed. R. Evid. 702, and remain "flexibl[e]" in evaluating the proposed expert's qualifications. *See U.S. v.*

*Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (holding that Fed. R. Evid. 702 "must be read in light

of the liberalizing purpose of the rule"); *Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222,

227 (N.D.N.Y. 1994) (Hurd, M.J.) ("[L]iberality and flexibility in evaluating qualifications

should be the rule; the proposed expert should not be required to satisfy an overly narrow test of

his own qualifications."), *aff'd without opinion*, 101 F.3d 682 (2d Cir. 1996). Having said that,

of course, "a district court may properly conclude that witnesses are insufficiently qualified . . .

[where] their expertise is too general or too deficient." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d

76, 81 (2d Cir. 1997), *accord*, *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413,

425-26 (W.D.N.Y. 2005); *Byrne v. Liquid Asphalt Sys., Inc.*, 238 F. Supp. 2d 491, 494 (E.D.N.Y.

2002); *Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247, 252 (S.D.N.Y. 1997); *see, e.g.*, *McCullock

v. H.B. Fuller Co.*, 981 F.2d 656, 657-58 (2d Cir. 1992) (affirming district court's ruling that

plaintiff's proffered expert did not possess the required qualifications to testify as an expert on

the subject of warning labels for hot melt glue).

Finally, a witness qualified as an expert will be permitted to testify if his testimony "will

assist the trier of fact to understand the evidence or to determine a fact in issue." *U.S. v.

Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (quoting Fed. R. Evid. 702). "To be admissible,

expert testimony must be both relevant and reliable." *Melini v. 71st Lexington Corp.*, 07-CV-

0701, 2009 WL 413608, at *4 (S.D.N.Y. Feb. 13, 2009) (citing *Daubert*, 509 U.S. at 589

[1993].) "Specifically, expert opinion testimony must be (1) 'based on sufficient facts or data,'

(2) 'the product of reliable principles and methods,' and (3) the result of applying those

principles and methods to the facts of the case in a reliable manner." *Melini*, 2009 WL 413608,

at *4 (quoting Fed. R. Evid. 702). "The proponent of expert testimony must establish its

admissibility by a preponderance of the evidence." *Id.* (citing *Astra Aktiebolag v. Andrx Pharm., Inc.*, 222 F. Supp. 2d 423, 487 (S.D.N.Y. 2002) [citing Fed. R. Evid. 104(a)].)

In *Daubert*, the Supreme Court set forth a non-exclusive list of factors for a trial court to use when assessing the reliability of expert testimony: (1) whether the expert's technique or theory can be, or has been, tested–that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94; *see also* Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments.

In addition, [c]ourts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact." Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments. These factors include the following: (1) whether the expert is "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying"; (2) whether the expert has unjustly extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations for the plaintiff's condition; and (4) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

In sum, the Second Circuit has explained the trial court's duties when evaluating expert

testimony in the following manner:

> First, . . . *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence. Second, it emphasizes the need for flexibility in assessing whether evidence is admissible. Rather than using rigid 'safeguards' for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the various considerations pertinent to the issue in question. Third, *Daubert* allows for the admissibility of scientific evidence, even if not generally accepted in the scientific community, provided its reliability has independent support. Finally, the Court expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence, and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.

*Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (internal citations omitted). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Instead, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union*, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004). "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'" *Melini*, 2009 WL 413608, at *5 (quoting *Amorgianos*, 303 F.3d at 267).

However, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; *accord*, *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005). Furthermore, "it is critical that an

expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id*. at 266 (citing *Daubert*, 509 U.S. at 595). Nevertheless, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co., v. Joiner*, 522 U.S. 136, 146 (1997). Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

### B. Legal Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[5] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law. . .Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes

---

[5]     As a result, "[c]onclusory allegations, conjecture, and speculaton . . . are insufficient to   create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citations omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita v. Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).[6]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[7] Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L. R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten up the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that

---

[6] Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issues arise. N.D.N.Y. L. R. 7.1(a)(3).

[7] *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

statement.[8]

Similarly, in this District, where a non-movant has willfully failed to respond to movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[9]  Stated another way, when a non-movant fails to oppose a legal argument asserted by the movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L. R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein. . ."); Rusyniak v. Gensini, 07-CV-0279. 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## IV.    LEGAL ANALYSIS

When assessing the merits of a motion for summary judgment, the district court can "decide the admissibility of evidence, including expert opinion evidence[.]" *See Foley v. United*

---

[8]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

[9]     *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

*States*, 294 F. Supp. 3d 83, 91 (W.D.N.Y. 2018) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 [2d Cir. 1997].)  This principle is based on the fact that, when a district court resolves a motion for summary judgment, it may "properly consider[ ] only evidence that would be admissible at trial." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).

Therefore, the Court will evaluate Defendant's motion to preclude Dr. Weingarten's expert report and proposed testimony before resolving the merits of Defendant's motion for summary judgment.  *See, e.g.*, *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated under Fed. R. Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion.").

### A.  Whether Defendant's Motion to Preclude the Testimony of Dr. Weingarten Should Be Granted

After careful consideration, the Court answers the above question in the affirmative for the reasons stated in Defendant's memoranda of law.  (*See*, *supra*, Part II.A. of this Decision and Order.)  To those reasons, the Court adds the following analysis.

In assessing whether expert witness testimony is admissible, the Court must first address "'the threshold question of whether a witness is qualified as an expert by knowledge, skill, experience, or education to render his or her opinions.'" *I.M. v. United States*, 362 F. Supp. 3d 161, 191 (S.D.N.Y. 2019) (quoting *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 [2d Cir. 2005].)  This first step means the Court determines "whether the proffered expert has the educational background or training in a relevant field . . . by looking at the totality of the witness's background." *Arista Records LLC v. Lime Grp. LLC*, 06-CV-5936, 2011 WL

1674796, at *2 (S.D.N.Y. May 2, 2011). Next, to ensure that the expert's testimony will be on the same "issues or subject matter[s] within his or her field of expertise," the Court must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004); *see also Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997). Furthermore, "[a]n expert 'need not be a specialist in the exact area of medicine implicated by the plaintiff's injury, [but] he must have relevant experience and qualifications such that whatever opinion he will ultimately express would not be speculative.'" *I.M.*, 362 F. Supp. 3d at 192 (quoting *Loyd v. United States*, 08-CV-9016, 2011 WL 1327043, at *5 [S.D.N.Y. Mar. 31, 2011].)

Based on the entirety of Dr. Weingarten's background, the Court concludes that he is qualified to offer expert testimony surrounding the nature and cause of Plaintiff's injury. As previously stated, Dr. Weingarten is an anesthesiologist that has practiced pain management for more than thirty-five years and continues to annually treat thousands of patients, including those with complex regional pain syndrome, one of the diagnoses that a physician has mentioned as the potential cause of Plaintiff's alleged ongoing symptoms.

However, even if Dr. Weingarten is qualified to offer such expert testimony, the testimony must be both relevant and reliable. With respect to the reliability requirement, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. A district court is not required to admit an expert opinion that is linked to the underlying data exclusively "by the *ipse*

*dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Although the rejection of expert testimony is the exception rather than the rule, it is perfectly within the district court's discretion to "conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.*, 522 U.S. at 146. For example, in instances "where an expert opinion is based on data, a methodology [or lack thereof], or studies that are simply inadequate to support conclusions reached, *Daubert* and Fed. R. Evid. 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. In other words, "[e]xpert testimony is inadmissible as unreliable where it consists of conclusory and speculative opinions, or where it lacks foundation." *Vale v. United States*, 673 F. App'x 114, 116-17 (2d Cir. 2016).

Here, Dr. Weingarten's expert report of August 7, 2018, indicates the following: (1) his background and credentials; (2) the records that he reviewed before rendering his expert opinion; (3) a recitation of events occurring on February 17, 2016, and thereafter, which include the various diagnoses Plaintiff received; (4) an overview of the procedure for administering a blood pressure measurement through the use of a manual blood pressure cuff; (5) a statement that using an undersized blood pressure cuff can result in an overestimation of the patient's blood pressure; (6) a statement that using an undersized blood pressure cuff will generally increase the baseline circumferential pressure before the taking of the patient's blood pressure, which would put the patient at risk for overinflation of the blood pressure cuff; (7) an opinion that an "oversized" sized blood pressure cuff should have been used when obtaining Plaintiff's blood pressure on February 17, 2016, as well as an opinion that the cuff should have been inflated to a pressure of only approximately 180 mmHg rather than 300mmHg; (8) an opinion that the use of an undersized blood pressure cuff leading to overinflation of the cuff to 300mmHg caused

Plaintiff's pain and swelling; (9) an opinion that, had the correctly sized blood pressure cuff been used, "it is more likely than not that the overinflation would not have occurred, and an accurate blood pressure reading would have been obtained with using the customary inflation pressure of approximately 170-180mmHg;" (10) an opinion that, as a result of this conduct, Defendant failed to meet the standard of care for blood pressure monitoring; and (11) an opinion that breach of the standard of care was the proximate cause of Plaintiff's injury. (Dkt. No. 35, at 188-91 [Weingarten Report].)

Dr. Weingarten also submitted a supplemental report on December 23, 2018, in which he stated the following: (1) MRI testing of Plaintiff's right arm showing soft tissue and subcutaneous edema suggests that overinflation of the blood pressure cuff caused excessive trauma to the right arm given the absence of any prior or subsequent trauma; (2) chronic regional pain syndrome can result from any kind of trauma to an extremity, including overinflation of a blood pressure cuff; and (3) overinflation of the blood pressure cuff was the proximate cause of Plaintiff's injuries. (Dkt. No. 25, at 205-07 [Weingarten Suppl. Report].)

In neither of these reports does Dr. Weingarten adequately explain the principles and methods that produced his opinions that (a) 300mmHg is sufficient pressure to cause an injury, and (b) use of an undersized blood pressure cuff increases the risk of injury. "An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006). Notably, at his deposition, Dr. Weingarten testified the following: (a) he does not know how much pressure is exerted by a manual blood pressure cuff during a routine examination in terms of pounds per square inch ("psi") because, "not having been a major physics person, it was

a little beyond my expertise"; (b) he does not know the exact amount of pressure (either in terms of mmHg or psi) beyond which injuries start to happen, only that vascular and neurological compromise can occur "if enough pressure is exerted," which he variously characterized as "a fair amount of pressure" or "excessive" pressure that compromises blood flow (without defining what would constitute "excessive" pressure); and (c) he was not qualified to render an opinion as to what the threshold pressure must be for injury to occur. (Dkt. No. 29, Attach. 3, at 143-45, 163-64 [Weingarten Dep.].) He also admitted during his deposition that he was unaware of any case in which a patient sustained a similar permanent injury from similar pressure using a manual blood pressure cuff (as was used on Plaintiff), only cases of injuries resulting from malfunctioning automated blood pressure cuffs.[10] (Dkt. No. 29, Attach. 3, at 130-31 [Weingartern Dep.].) Given Dr. Weingarten's own admission that he does not know at what

---

[10] In his supplemental report, Dr. Weingarten discusses a medical case study article referenced by Defendant's expert Dr. Bowley, opining that "the fact that an ulnar neuropathy has been described in the medical literature in association with compression by a blood pressure cuff supports the injury which befell [Plaintiff]." (Dkt. No. 35, at 205 [Weingarten Suppl. Report].) However, Dr. Weingarten's conclusory statement on this matter is not based in the facts of the study itself. In this study, it is noted that five of the eight studied patients experienced the neuropathy symptoms in the arm on which the blood pressure cuff had *not* been used (but in which they had an anteriovenous shunt or fistula), and, of the three patients who were monitored by an automated blood pressure cuff, there was only a single patient in which the neuropathy occurred in the same arm as where the blood pressure cuff was used. Z. Zylicz, F.J.J. Nuyten, S.L.H. Notermans, R.A.P. Koene, *Postoperative Ulnar Neuropathy After Kidney Transplantation*, Anaesthesia, 1117, 1118-19 (1984). The study's authors stated that "repeated cuff inflation may add to the other factors that increase local pressure," and concluded that the fact that only one of the three patients on whom an automated cuff had been used had neuropathy occurring in the monitored arm "suggests that the use of this device played no major role in the development of the lesion." *Id.* at 1119. The study's authors also noted that, since certain precautions had been taken (including use of a manual blood pressure cuff placed in a way to prevent ulnar compression), there had been no new cases of neuropathy reported. *Id.* at 1119. As Defendant's expert argues, this study simply does not support a finding of causation here, and Dr. Weingarten has failed to provide any explanation as to how it does support such a finding other than through a wholly conclusory assertion lacking any rational or evidentiary basis.

point pressure becomes "excessive" or sufficient to cause damage, the Court can see no reliable basis for his opinion that 300mmHg (whether or not the blood pressure cuff was undersized) could cause an injury like the one Plaintiff alleges here.

Furthermore, in addition to being unable to point to any cases or studies finding similar injuries under similar circumstances, or to any scientific knowledge about the threshold pressure required to create injury, Dr. Weingarten's expert report does not include or indicate that he attempted to test his hypothesis or recreate an injury similar to what Plaintiff sustained. As a result, there is an inadequate explanation of the principles and methods that produced Dr. Weingarten's opinion, and/or an inadequate showing that he reliably applied those principles and methods to the facts of this case.

Consideration of two other factors identified by courts as relevant also point to the conclusion that Dr. Weingarten's opinions are unreliable. First, it appears that he developed his conclusions about blood pressure cuffs and the effects of overinflation for the purposes of testifying in this matter and not as the result of research he had been conducting independent of the litigation.

Second, Dr. Weingarten has not accounted for any obvious alternative explanations for Plaintiff's injury other than the blood pressure cuff. Evening setting aside the five-day delay that occurred between Plaintiff's initial blood pressure reading and the diagnoses of an injury (during which time the injury could have been caused by some other trauma), the Court notes that the medical records establish that Plaintiff also had a venipuncture (i.e., blood draw) with application of a tourniquet on her right arm on February 17, 2016. (Dkt. No. 29, Attach. 8, at 16; Dkt. No. 29, Attach. 9, at 1, 20; Dkt. No. 29, Attach. 10, at 1, 2, 7, 10, 13, 16.) Dr. Weingarten has not

offered any testimony as to whether the venipuncture could have been a contributing cause to her injury, whether that procedure was performed according to the appropriate standard of care, or whether performing both the blood pressure cuff testing and the venipuncture to the same arm deviated from the appropriate standard of care or could have caused the injury. Additionally, as Defendant's experts point out, the diagnostic and objective testing shows that (a) even if there was swelling around the ulnar nerve present in the MRI, both the MRI and the EMG substantiate that the ulnar nerve was functioning in a normal manner, which does not support the existence of an ulnar nerve injury, and (b) the evidence of nerve dysfunction was in places that were beyond the muscles that are innervated by the ulnar nerve (i.e., the nerve dysfunction would not have resulted from trauma at the site where the blood pressure cuff was applied). (Dkt. No. 29, Attach. 6, at ¶¶ 6 [Bowley Decl.]; Dkt. No. 29, Attach. 6, at 16-17 [Bowley Report].) Dr. Weingarten does not address whether dysfunction of a different nerve (such as the median nerve involved in the carpal tunnel syndrome assessed at Plaintiff's right wrist) could be the cause of some or all of Plaintiff's ongoing reported symptoms.

Furthermore, as to the issue of specific causation in this case, there is no mention by Dr. Weingarten in his reports that he (a) had ever measured or knew the circumference of Plaintiff's arm, or (b) knew with any reasonable certainty the size of the blood pressure cuff that had actually been used on Plaintiff. Because Dr. Weingarten's conclusions as to causation are based in part on the fact that an undersized cuff would "increase the baseline circumferential pressure" (i.e., "create more compression when it was over-inflated than the correct size"), his lack of knowledge of the size of Plaintiff's arm and the size of the blood pressure cuff used in the exam undermine his conclusions and render them speculative. (Dkt. No. 29, Attach. 3, at 187

[Weingarten Report]; Dkt. No. 29, Attach. 3, at 140 [Weingarten Dep.]; Dkt. No. 34, Attach. 3, at ¶ 7 [Weingarten Decl.].)

Finally, even if the fact that Nurse Benevides-Stevens might have deviated from routine blood pressure practice by inflating the blood pressure cuff to 300 mmHg rather than 10mmHg above the systolic blood pressure (in this case, to a pressure of approximately 158 mmHg, according to Dr. Weingarten) were sufficient to show a deviation from the standard of care (something that Defendant disputes), it would not be sufficient to show causation because, as discussed above, Dr. Weingarten has not adequately explained the principles and methods that produced his opinion that 300mmHg was a sufficient amount of pressure to cause the type of injuries Plaintiff suffered. (Dkt. No. 34, Attach. 3, at ¶ 13 [Weingarten Decl.].)

For all of these reasons, the Court finds that Dr. Weingarten's opinions on the relevant issues are speculative and unreliable, and therefore inadmissible.

The Court acknowledges that Plaintiff argues that the circumstances of the expert testimony in this case are similar to the circumstances of the expert testimony in *Zuchowicz v. United States*, 140 F.3d 381, 385-86 (2d Cir. 1998), where the Second Circuit found that the district court had properly declined to exclude the expert witnesses' testimony. However, there are multiple notable differences between that case and this case that merit a different outcome here. Most relevant, in *Zuchawicz*, although there was no anecdotal evidence of a connection between the overdose of the particular drug prescribed to the plaintiff and the rare medical condition that she developed, the Court found that the opinion was sufficiently reliable based on the expert's citation to the temporal connection between the overdose and the development of the condition, his ruling out of any secondary causes (i.e., a heart or lung condition) in part based on

25

his own examinations of the plaintiff, his ruling out any of the other known drug-related causes of the condition in question, and his discussion of the similarities in the timing and course of development of the condition with cases caused by other drugs known to cause the condition. *Zuchowicz*, 140 F.3d at 385-86. In this case, as already discussed, Dr. Weingarten did not assess or exclude other possible causes of Plaintiff's symptoms (such as the venipuncture or the demonstrated compromise of the median nerve), nor did he point to other modes of compression that exert a similar force for a similar amount of time in a similar manner that have demonstrably produced a similar injury. Additionally, in *Zuchawicz*, a second expert opined that the overdose of the drug was the cause of the plaintiff's condition by examining the hormonal effects such an overdose would cause and by linking those hormonal effects (using studies) with the underlying physical changes that produced the condition. *Zuchowicz*, 140 F.3d at 386. In this case, Dr. Weingarten produced no testing, studies, or scientific evidence even suggesting that 300mmHg of pressure could produce the alleged injury. Simply put, the opinions from the experts in *Zuchowicz* were supported by a sufficient scientific or medical basis in a way Dr. Weingarten's opinion is not.

Finally, the Court finds that, in making the determination that Dr. Weingarten's expert opinion is inadmissible, the Court is not required to hold a hearing. *See Hunt v. CNH Am. LLC*, 511 F. App'x 43, 47 (2d Cir. 2013) (finding that the district court's exclusion of the expert testimony without holding a hearing was not manifestly erroneous); *Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (stating that "nothing in *Daubert*, or any other Supreme Court or Second Circuit case, mandates that the district hold a *Daubert* hearing before ruling on the admissibility of expert testimony, even when such ruling is

dispositive of a summary judgment motion").  The Court notes that Plaintiff submitted a

declaration from Dr. Weingarten along with its opposition to Defendant's motion for summary

judgment that allowed him an opportunity to respond to Defendant's arguments about the

reliability of his opinion, and yet nothing in that declaration provided any additional information

about the basis for Dr. Weingarten's opinions.  Based on this failure and Dr. Weingarten's

previous deposition testimony (as discussed above) regarding his lack of knowledge about the

level of pressure needed to cause injury, the Court is not convinced that a hearing related to the

admissibility of Dr. Weingarten's testimony would be of any benefit.

### B.     Whether Defendant's Motion for Summary Judgment Should Be Granted

After careful consideration, the Court answers the above question in the affirmative for

the reasons stated in Defendant's memoranda of law.  (*See*, *supra*, Part II.B. of this Decision and

Order.)  To those reasons, the Court adds the following analysis.

To establish a claim of medical malpractice (that is, negligence by a medical professional

related to medical treatment or assessment) under New York law, a plaintiff must show that (1)

there was "a deviation or departure from accepted practice" (e.g., the standard of care in the

community), and (2) "such departure was a proximate cause of injury or damage." *Berk*, 380 F.

Supp. 2d at 342; *see Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016).  "In order to

show that the defendant has not exercised ordinary and reasonable care, the plaintiff must

ordinarily show what the accepted standards of practice were and that the defendant deviated

from those standards or failed to apply whatever superior knowledge he had for the plaintiff's

benefit." *Berk*, 380 F. Supp. 2d at 342-43 (quoting *Sitts v. United States*, 811 F.2d 736, 739-40

[2d Cir. 1987]).  Additionally, in showing causation, a plaintiff has the burden of establishing

both general causation (i.e., that the blood pressure cuff at issue was capable of causing injuries such as swelling and nerve compression and/or damage), and specific causation (i.e. that the blood pressure cuff was a substantial factor in causing Plaintiff's injuries in this case). *Amorgianos*, 303 F.3d at 268.

"It is well established in New York law that 'unless the alleged act of malpractice falls within the competence of a lay jury to evaluation, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice.'" *Berk*, 380 F. Supp. 2d at 343 (quoting *Sitts*, 811 F.2d at 739); *see also Vale*, 673 F. App'x at 116 (noting that both elements of a medical malpractice claim "must be established by expert testimony, unless the testimony is within the ordinary knowledge and experience of the jury").

Here, because the effect of using an undersized blood pressure cuff and whether pumping a blood pressure cuff (undersized or not) to 300mmHg is sufficient to cause tissue swelling and nerve compression are matters beyond the competence of a lay jury, Plaintiff is required to present admissible expert testimony in order to succeed on her claim. As discussed above, Dr. Weingarten's testimony on these matters is not admissible due to its lack of reliability. Consequently, because Plaintiff has not offered admissible expert testimony that genuinely disputes the expert testimony offered by Defendant (opining that the use of the blood pressure cuff was not the proximate cause of Plaintiff's injury), Plaintiff's claim must fail.

For all of these reasons, the Court therefore grants Defendant's motion for summary judgment.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion to preclude (Dkt. No. 29) is **<u>GRANTED</u>**; and it is

further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 29) is

**GRANTED**.

Dated: March 17, 2020
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge